NOTICE
Decision filed 10/22/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220757-U

NO. 5-22-0757

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Randolph County. |
| | ) | |
| v. | ) | No. 22-CF-20 |
| | ) | |
| KHRISTOPHER M. DIERCKS, | ) | Honorable |
| | ) | Richard A. Brown, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reverse the trial court's finding that the defendant was guilty of stalking where the evidence was insufficient for a rational trier of fact to find beyond a reasonable doubt that he made true threats directed at the alleged victim.

¶ 2    The defendant, Khristopher M. Diercks, was convicted of stalking after a bench trial and sentenced to 24 months of conditional discharge. The defendant appeals, contending both that the evidence was insufficient to convict him, and that the conviction violated his constitutional rights under the Illinois and United States Constitutions. For the reasons that follow, we reverse.

¶ 3                                    I. BACKGROUND

¶ 4    On February 14, 2022, the State charged the defendant via information with stalking, in that he knowingly engaged in a course of conduct directed at Sheriff Shannon Wolff at a time he knew such conduct would cause a reasonable person to fear for his safety. See 720 ILCS 5/12-

1

7.3(a)(1) (West 2020). Specifically, the State alleged that he repeatedly sent text messages of a threatening nature to Wolff.

¶ 5     On February 11, 2022, the defendant sent several text messages to Wolff to get Wolff to put him in contact with one of Wolff's deputies. As this text conversation was going on, Wolff sent deputies to arrest the defendant, and the defendant was taken into custody. The defendant pled not guilty, rejected a plea deal, and elected to proceed on a bench trial, which took place on September 1, 2022.

¶ 6                                   A. Trial

¶ 7                          1. *Sheriff Wolff's Testimony*

¶ 8     At trial, the State's only witness was Sheriff Wolff, the alleged victim, who testified that he had known the defendant for approximately 20 years. Wolff confirmed that the defendant had previously texted and called him. The State introduced its first exhibit, a screenshot of a text message the defendant sent to Wolff's cell phone on February 6, 2022. Wolff testified that, on that date, the defendant texted him about a confrontation he had with his uncle over his grandmother's care. The defendant and Wolff then had a phone call, during which Wolff told the defendant that, if there was an issue that required police, he needed to call the sheriff's office. Wolff testified that he had told the defendant this "several times in the past." The trial court then admitted the State's second exhibit, a screenshot of a text message the defendant sent to Wolff's cell phone on February 11, 2022, which began with the words "hey f***er." Wolff testified that he did not usually receive messages that began in that manner. Upon receiving the message, Wolff was immediately concerned that this "would be the beginning of it." Wolff received approximately 23 text messages from the defendant throughout the morning hours of February 11, and he perceived the content of those messages as "threatening." The initial message stated as follows:

2

"Hey f***er, take your BBQ and stick it up your mf'ing ass…Your ol friend Rick Schroeder *** [(various laughing emojis)] That fat f*** can't cook anywhere near as good as me. *** [(middle finger emoji)] I told your ass, I ain't no damn fool. But, sometimes a person just got to play the roll [*sic*] of a fool to fool the fool who thinks he's foolin you. *** So now, I got just two more moves to make and I'm hoping it's gonna help you sorry ass SOB's who took my life from me!! You send my friend to see me!! I got something to show him. And when my brother brings it back to you. He will hopefully have what you need. Because there's 2 brothers not from around here that have ripped our community apart with this f***ing dope. And I'ma make Ryan coffee's mf'ing day!! And from here on out, when you address me. You add Sir to the end of my name!! *** [(bicep emoji, middle finger emoji, peace sign emoji, kiss emoji, American flag emoji)]."

Wolff testified that he took the message to mean that the defendant was "aggravated and irate," and that the message made him nervous.

¶ 9     The State then introduced its third and fourth exhibits, which were both screenshots of further messages Wolff received from the defendant during the morning hours of February 11. Wolff again testified that he took those messages to mean that the defendant was "agitated and that he wanted something." Wolff described the messages as "cussing at me again" and "threatening again." The message stated as follows:

"You got less than half an hour and I'm gonna probably loose [*sic*] my shit!! *** [(angry expletive emoji)] My anxiety is in full force right now!! I am running on shear fumes!! Stress level to the f***ing max!! And I'm gonna let you mf'ers nail me to the f*** cross one last time. I don't even care no more!! The mf'ers ain't gonna hurt another shorty on my watch. And if it means I go back to the joint for doing the right thing then I don't give a f***!! Read me my right's, put me in jail. Take me downtown Barney lock me up!! Shannon you goin through some shit right now with your family. I get it!! Mf'er you think I ain't know?! You got your Wolfpack. And I got mine!! We can fight it out till the bitter end. Or you can let us help you. Either way I don't give a f*** no more!! In the end I will come out on top!! Because I've paid for my crime!! I'm standing on solid ground!! And I can't be shook. I'm extending my hand. You either gonna reach out and help me help you. Or you can come in thinkin I'm no good like my *** family. *** You know the routine. Heres the deal, I have what you need on the way to me right now. And I need my friend to ring this f***ing phone before it gets here!! You got less than 15 min. Otherwise you gonna waste a shit load of my time and effort trying to help our community. Every mf'er got a preconceived notion. Let me prove them wrong by taking all my struggles and turning them from bad to good. Asked you once before. I'll ask you again. Which side are you on?! 15 minutes is all I got. Don't be late!! You f*** this up that I have done invested so damn much time and money into and I ain't gonna invite you to the farm again. I promise you I will walk right through those doors and come strait [*sic*] to you just like I did when y'all

3

was investigating me for this bullshit I'm being charged with now!! We not kids no more Shannon. Kids make mistakes. Adult's make choices. Buddy you gonna learn today!! Now for the last time before you blow this! Have my friend call me!!"

With regards to the message, Wolff concluded that "basically the entire thing [was] threatening."

¶ 10 The State then introduced its fifth exhibit, which was a screenshot of three separate YouTube links the defendant sent Wolff on February 11. Wolff testified that he clicked on these links and watched the videos. After watching the videos, Wolff "felt threatened" because, in his estimation, "all three of them were threatening." The first link was to a video of a song by the artist Brantley Gilbert called "Read My Rights." The next exhibit the State introduced, marked as its twenty-second exhibit, was a copy of the lyrics to that song. Wolff testified that the lyrics "[talked] about whooping ass" and described how the singer was going to "drop this fool right in front of the cops." Wolff concluded that "the lyrics are threatening if you read it or listen to it, there's no doubt about it." The second link was to a video of a song called "I'm Still Here." Wolff testified that, when he listened to this song, he "was a little confused by it." The third link was to a video of a song called "Whoop a Man's Ass." Wolff perceived "even the title of that song" as "threatening." The State then played the video for "Whoop a Man's Ass" for the court. Wolff testified that he "felt that [the defendant] was speaking to [him]" through the song, and that "[the defendant] wanted to do those things to [him]." The court then admitted into evidence copies of the lyrics to all three songs and their YouTube hyperlinks, which were marked as State exhibits 22, 23, and 24.

¶ 11 The State then introduced its sixth and seventh exhibits, which were both screenshots of further messages Wolff received from the defendant during the morning hours of February 11. Wolff then read exhibit six. The message read:

4

> "You watch those. I call you. 'Check' one move will end the game. Don't matter what move you make. My next move is check mate. [(winking emoji)] By the way. I love you brorher [*sic*]. Don't give a f*** if you like it or not!! That's just who I am!!"

Wolff testified that he "was very concerned at [this] point" because of the word "checkmate." At that point, Wolff called the State's attorney and "requested that [they] do something and inquired whether or not [they] could charge [the defendant] with threatening [Wolff] and began that process of getting that done." After this call, Wolff responded to the defendant via text message, asking him what he wanted Wolff to do. Wolff testified that he responded at this time because he "wanted to know *** where he was at, just to have some idea that I had him talking still. I didn't know if he was coming to my house, what he was doing. And it was basically to stall him, keep him talking at that point, so we could get officers to his house."

¶ 12    Wolff then described the text messages contained in the State's seventh exhibit. Wolff testified that the defendant sent him "a link to a YouTube video of Christopher Walken *** from the Poolhall of Junkies movie," as well as another link to Christopher Walken's "lion speech on YouTube." The defendant then told Wolff to "have [his] friend call [him]" while Wolff watched the videos. Wolff testified that he watched both videos the defendant sent him. The State then introduced what was marked as its twenty-fifth exhibit, a copy of the transcribed "lion speech" by Christopher Walken. The State then played the YouTube video the defendant sent of the lion speech for the court. This court watched the same linked video. The linked video depicts Christopher Walken in the 2002 movie *Poolhall Junkies*, reciting the following speech to another character:

> "You watch those nature documentaries on the cable? You see the one about lions? You got this lion. He's the king of the jungle, huge mane out to here. He's laying under a tree, in the middle of Africa. He's so big, it's so hot. He doesn't want to move. Now the little lions come, they start messing with him. Biting his tail, biting his ears. He doesn't do anything. The lioness, she starts messing with him. Coming over, making trouble. Still nothing. Now the other animals, they notice this. They start to move in. The jackals; hyenas.

5

They're barking at him, laughing at him. They nip his toes, and eat the food that's in his domain. They do this, then they get closer and closer, bolder and bolder. Till one day, that lion gets up and tears the shit out of everybody. Runs like the wind, eats everything in his path. Cause every once in a while, the lion has to show the jackals, who he is."

After Walken recites the speech, he states to the other character: "It's too late to be scared. It's time to kill. I'm going in the other room. You come out when you're ready. Don't beat him. Kick his ass." The video then transitions into a humorous video edit of scenes from the movie, set to the song "Hustlin' " by Rick Ross.

¶ 13 Wolff testified that, after watching the lion speech video, he "was even more concerned" and "definitely felt threatened." At that point, he went to his wife and told her to keep their children in the house. He also went out to his car and retrieved his AR-15 rifle. The State then introduced its eighth, ninth, tenth, eleventh, and twelfth exhibits, which were all screenshots of further messages Wolff received from the defendant on February 11. Wolff testified that the defendant sent him messages and pictures via text message. The pictures were of a sales receipt for a gun vault, a black gun vault, and what Wolff perceived to be "an ammo tote box." After seeing the pictures, Wolff kept responding to the defendant to keep him occupied because Wolff knew deputies "were on the way *** to pick [the defendant] up."

¶ 14 The State then introduced its fourteenth through nineteenth exhibits, and its twenty-first exhibit, all of which were screenshots of further messages Wolff received from the defendant on February 11. Wolff testified that the defendant continued to message him until his arrest that afternoon. Wolff described the remainder of the text messages he received from the defendant that day as "rambling, *** talking about his family *** and different stuff that had happened, [and] stating he was a good person." The defendant also sent Wolff "a picture of a $25,000 check his grandma had written him" before returning to "just rambling on about different things." Wolff testified that he was "absolutely" concerned about his physical safety at this point.

6

¶ 15 On cross-examination, Wolff confirmed that he had known the defendant for around 20 years, and that his property was close to the defendant's grandmother's property. Wolff testified that he had been in law enforcement for 26 years, and that the defendant had been in some trouble with the law in the past. Wolff conceded that he "probably" told the defendant's wife after the defendant's arrest that, although he understood it was hard for the defendant to communicate in a way that most people would consider normal, he needed to find a better way to do so. Wolff agreed that the defendant was probably around 45 years old and 300 pounds but contested that he had ever seen the defendant with a cane before. Wolff testified that he was 50 years old and in "somewhat" good physical shape.

¶ 16 Wolff confirmed that the text messages he received from the defendant on February 11 made him concerned for the safety of himself and his family. The first text message came in at 9:27 a.m. that day. Wolff confirmed that he notified the State's attorney about the defendant's messages "sometime after [he] received them," but he could not be sure "exactly what time it was." Wolff also confirmed that he continued talking to the defendant to keep him "engaged." Wolff conceded that he did not ask his deputies to do extra patrols around his home; ask for an exigent circumstances ping on the defendant's phone, which would have revealed the defendant's location; or issue an Illinois State Police Emergency Radio Network (ISPERN) alert, which would have advised officers in southern Illinois to look out for the defendant or his vehicles. Wolff confirmed that, although he had been at home at the time of the incident, he could have contacted an employee at the sheriff's department and asked for a be-on-the-lookout (BOLO) radio dispatch for the defendant, but he did not. Wolff also confirmed that he did not take his family to his office at the sheriff's department. While Wolff argued that taking his family to the sheriff's department would

not have been helpful because deputies were most likely out looking for the defendant, he conceded that he could have commanded one or two of them to return to guard him and his family there.

¶ 17 Wolff testified that he had dealt with stalking cases before and received training on steps victims can take to protect themselves. Wolff confirmed that, although one of those steps was to call 9-1-1 if something happened, he did not call 9-1-1 at any point during this incident. The court took judicial notice that February 11, 2022, was a holiday in the state of Illinois, during which the courthouse was closed. Wolff was unsure whether there were ways to obtain a stalking or no contact order on an emergency basis when the courthouse was closed. Wolff testified that he had blocked the defendant's phone number in the past, but at the time of the incident, the defendant's number was unblocked for some reason. Wolff confirmed that, on February 11, he sent 10 responses to the defendant's messages, never told the defendant to stop texting him, and only once told the defendant that he found one of his messages to be threatening. Wolff testified that, in his 26 years as a law enforcement officer, despite being involved in high speed chases, executing search warrants, responding to volatile domestic situations, and pulling his duty weapon, he had never been this concerned about a threat made. Wolff confirmed that he did not give an audio-video recorded statement about the incident to any outside agencies, and instead solely wrote a narrative of what happened.

¶ 18 Defense counsel then directed Wolff's attention to the State's first exhibit, which was a screenshot of a text message the defendant sent Wolff on February 6, 2022. The message reads:

"Sorry for bothering you tonight Shannon. But we have been helping tend to grandma on the farm. She has had knee surgery on her other knee. While out there today I want you to know I was threatened with my life by my Uncle Rick Schroeder and Aunt Jean Schroeder. I have several that seen what happened. But I do not wish to bring harm to them as they will cause their own grief in the end. I have made amends with some of my family. My Uncle Bill Gross and Aunt Joan Gross. I will be coming to the farm around midnight to stoke the fire in her furnace. And tend to my chores. And I am bringing 2 with me incase I need to prove what I say. I'm praying things work themselves out. And there is no more

8

issue's. But want you to know what's going on incase there is trouble. As to there was a huge gathering up the hill at Josh Burners residents. He is married to my Aunt Brenda Youngwalter used to be webber. I don't want you to bring any harm to them unless they act foolish. Then it's in God's hands. But instead I ask that you simply do nothing and pray for our family during these [trying] time's that everything works out for the Good!! Love you brother. And once again. Thank you for everything. Take care my friend. And God bless you and your home [during] these trying times we are all facing. And know that if ever you need me. All you need to do is simply ask. I got your 6. And want to tell you that I am very grateful that you had mine. Good night good sir. God Bless."

Wolff confirmed that the message started with the defendant apologizing for bothering him at night and ended with the defendant telling him that he loved him, thanking him for everything, telling him to "take care," addressing him as his "friend," and telling him that he had Wolff's "6," which is military slang for having someone's back. Wolff testified that, although he had previously told the defendant not to contact him on his personal cell phone, on February 6, he still responded to the defendant's text message and answered his phone call.

¶ 19    Defense counsel then directed Wolff's attention to the State's second exhibit, which was a screenshot of a text message the defendant sent Wolff on February 11, 2022. The message was directly transcribed from the exhibit earlier in this order. Wolff confirmed that he became concerned upon receiving this message because it began with the words "hey f***er." Wolff agreed that, as a law enforcement officer, he was used to citizens sometimes using profane language against him. Wolff clarified that, in the series of text messages the defendant sent him on February 11, the defendant repeatedly asked Wolff to have Shane Rinehart, one of Wolff's deputies, contact him. The defendant also sent Wolff a music video of a song by the artist Brantley Gilbert. Wolff agreed that the song's lyrics described an act of vigilantism against someone who committed a battery against a woman. The defendant also sent Wolff a music video of a song by the band Twang and Round. Wolff agreed that the music video depicted a sheriff following men who were seemingly engaging in criminal activity, but who were actually revealed to be doing

9

community service. Finally, the defendant sent Wolff a song called "Whoop a Man's Ass" by the artist Trace Adkins. Wolff agreed that the song had an aspect of vigilantism, as expressed through one of the lyrics: "If you let me catch you cussing out a kid or roughing up a lady, and God forbid that anybody mess with that little girl of mine."

¶ 20    Defense counsel then directed Wolff's attention to the State's sixth exhibit, which was a screenshot of another message the defendant sent Wolff on February 11. The message was directly transcribed from the exhibit earlier in this order. Wolff confirmed that the defendant ended the text message by saying: "I love you brother. Don't give a f*** if you like it or not." Counsel then directed Wolff's attention to the State's eighth exhibit, which was another screenshot of messages the defendant sent Wolff on February 11. Wolff agreed that one of the messages was: "I'm coming to you out of love with a heart full of pain." Counsel next directed Wolff's attention to the State's thirteenth through fifteenth exhibits. The thirteenth exhibit was not provided to this court. The fourteenth and fifteenth exhibits were both screenshots of messages the defendant sent Wolff on February 11. Wolff agreed that some of the included messages were: "Take care, buddy," "God bless," and "Thank you from the bottom of my heart."

¶ 21    Wolff confirmed that the defendant also sent him a video depicting a 15-minute commencement speech by the actor Matthew McConaughey, wherein McConaughey gives general positive life advice. Counsel directed Wolff's attention to the State's sixteenth exhibit, which was also a screenshot of messages between the defendant and Wolff on February 11. Wolff confirmed that at 12:35 p.m., he texted the defendant: "This video is particularly disturbing and threatening. Why would you send me that?" Wolff clarified that he was referring to one of the Christopher Walken videos that the defendant had sent at 11:01 a.m. in that text, not the Matthew McConaughey video. Wolff admitted that between 11:01 a.m., when the defendant sent him the

10

Christopher Walken videos, and 12:35 p.m., when Wolff told him he found one of those videos threatening, Wolff sent the defendant four other text messages. Wolff also confirmed that, by that time, he had already notified his deputies and the State's attorney of the situation. Wolff was aware that his officers made contact with the defendant at approximately 1 p.m. on February 11, and that he sent his last text to the defendant at 1:01 p.m. that day.

¶ 22 On redirect examination, Wolff testified that, upon his arrest, the defendant reacted badly. His behavior at the Randolph County jail included "kicking the cell door [and] wrestling in the restraint chair," which he spent several days in. Wolff also testified that he had frequently seen the defendant "at his grandma's house *** working on tractors, riding around, doing stuff, lifting things." Wolff again emphasized that he had never seen the defendant with a cane before, and that "there [was] no doubt that [the defendant was] physically capable of doing something." Wolff testified that he was so "extremely concerned" about the defendant's messages that he "went out and got [his] rifle out of his squad car and brought it into [his] house," and even "installed a $3,000 security system in [his] house *** with cameras." Wolff stated that he was "still concerned." Wolff testified that he did not put out an ISPERN alert that day because he felt that obtaining his AR-15 and being in his residence was adequate protection. He also knew that law enforcement officers were aware of the situation and on their way, and that state police oftentimes did not wish to get involved with investigations of local charges in Randolph County. He insisted that, even if he had called the state police for help, since it was a state holiday on February 11, "it would take a lot of time even to get them there, and [he] felt that this needed to be acted on immediately."

¶ 23 Wolff felt that the defendant's messages demonstrated mental instability and a "level of *** agitation." Wolff stated that "it actually made it worse, you know, somebody saying, 'I love you, brother.' " Wolff clarified that the phrase "I love you, brother" was "not a common thing that

11

I have happen to me with interaction with people I work with or deal with at my work. *** It just showed he was mentally unstable at that point, in my opinion." On recross, Wolff confirmed that he went to observe the defendant in his cell at the Randolph County jail on February 13, 2022, after the defendant asked to see him. Wolff also confirmed that, although he had the opportunity to bring in an outside agency at a later date, he did not do so.

¶ 24                                   2. *The Defendant's Testimony*

¶ 25     The defendant then testified in his own defense. He testified that he was 45 years old, married, and self-employed, working on his grandmother's farm. He confirmed that he had known Wolff for "longer than" 20 years, and that the two went to school together. He admitted sending Wolff text messages on February 6 and 11, stating that he and Wolff "had been talking back and forth for years," and that Wolff had "accepted multiple calls" from him. Defense counsel directed the defendant's attention to the defense's first exhibit, which was a photograph of a cell phone with text messages between Wolff and the defendant from February 6 on screen. The top of the screen shows part of the message the defendant sent to Wolff. That entire message was directly transcribed from the State's first exhibit earlier in this order. The bottom of the screen shows Wolff's reply to that message, which the defendant read aloud for the court: "What in the hell are you talking about." Counsel then directed the defendant's attention to the defense's second exhibit, which was a different photo of the cell phone with a call and message log on screen. The defendant pointed out that the call log showed that on February 6, 2022, Wolff accepted the defendant's phone call, which lasted for seven minutes and eight seconds. The defendant testified that the phone call concerned an altercation he had had with his uncle. The defendant told Wolff that his "uncle had come out to the farm, had blocked [him] in [his] truck, kept [him] from going anywhere, screaming, hollering," and that the defendant had eventually driven away from his uncle and gone

12

to fix a fence in the back of the farm. The defendant testified that Wolff had said he did not believe him. The defendant told Wolff that he had witnesses, but that he did not want his uncle arrested because he cared about his uncle and believed he had been intoxicated. The defendant testified that he called Wolff "to make him aware and ask his advice," but that "instead [he] got *** the cold shoulder," with Wolff telling him that "he didn't believe [the defendant], and he wouldn't listen to [his] witnesses."

¶ 26    The defendant then testified that the next day, February 7, 2022, he was arrested at his home for an alleged battery of his uncle, Oscar McMath. At the time of his arrest, the arresting deputy and the defendant had a conversation that later affected his decision to send a picture of a gun safe to Wolff on February 11. The defendant testified that he sent that picture of a gun safe to Wolff "to show him that I was doing what he himself had advised me to do on a previous occasion and to let him know that I did buy the safe, I did buy the ammo box, everything's as it should be."

¶ 27    Defense counsel then directed the defendant's attention to the text message contained in the State's second exhibit, which was directly transcribed from that exhibit earlier in this order. The defendant testified that he texted Wolff because "of the way [he] was feeling towards [his] uncle over his actions and the way Mr. Wolff treated [the defendant] whenever [he] tried to call him to report what happened." The defendant admitted that he felt frustrated and was trying to be "smart-alecky" in his message because he was "dissatisfied with [Wolff's] actions."

¶ 28    The defendant first addressed this line in that message: "But, sometimes a person just got to play the roll [sic] of a fool to fool the fool who thinks he's fooling you." The defendant explained that everybody thought he was "a dummy because of the way [he talked] and the way that [he portrayed himself]." The defendant was aware that people did not "quite understand" him. However, the defendant believed he was "actually quite intelligent." The defendant believed that

13

he had "single-handedly [found] out some information" that he wished to "help Mr. Wolff with, but *** [Wolff] didn't want [the defendant's] help." According to the defendant, "there [were] 15 kilos of crystal meth coming into the area," and the defendant "knew where it was coming in at" and who was bringing it in. He had gotten this information from a friend's son, an addict the defendant was trying to help. The defendant explained that he "was going to try [his] best to get it off the streets because that's what killed [his] mother," who had been "hooked on dope and stuff and all that." The defendant also "had a spell with it [when he] was younger." The defendant was adamant that he did not "want that stuff around because it [had] ruined many, many lives."

¶ 29   The defendant then addressed these lines in his message: "You send my friend to see me!! I got something to show him. And when my brother brings it back to you. He will hopefully have what you need." The defendant explained that the "friend" he referred to was Deputy Shane Rinehart, "the only officer [that] ever actually paid attention to what [he] *** said." The defendant also addressed this line in his message: "And I'ma make Ryan coffee's mf'ing day!!" The defendant explained that Ryan Coffey was "the detective down at Randolph County who investigates things like that." Finally, the defendant addressed the last line in his message: "And from here on out, when you address me. You add Sir to the end of my name!! *** [(bicep emoji, middle finger emoji, peace sign emoji, kiss emoji, American flag emoji)]." He explained that he texted this to Wolff because he was "tired of people looking down on [him] and talking about [him] and accusing [him] of things that [he didn't] do."

¶ 30   Defense counsel then directed the defendant's attention to the text message contained in the State's third exhibit, which reads:

> "Hey, my time is very valuable brother. I spent a long f***ing time on this for your dumb asses. and I am literally running on fumes!! I asked you to have your Deputy call me!! That's what you said you wanted!! Now you have my friend call me!! I won't ask nicely again!!"

14

The defendant explained that he had "been up all night trying to find out information" about the people who were allegedly bringing a shipment of drugs into Randolph County, which was hard, because "whenever they do stuff like that, they're very secretive about what they do and it's hard to pinpoint them." The defendant wanted to "make sure that they got caught." He testified that he even knew the names of the two men who were allegedly bringing the drugs in. The "deputy" and "friend" he referred to was Deputy Rinehart. The defendant told Wolff that "that's what [he] said [he] wanted" because Wolff had, at multiple times in the past, told him that he was not the defendant's "personal cop" and had instructed him to call Wolff's deputies instead of Wolff directly. When the defendant wrote that he "wouldn't ask nicely again," he meant that "if they didn't take care of it and get somebody over there[,] *** [he] was going to take matters into [his] own hands and *** do whatever [he] could to stop that shit from coming in." The defendant expounded upon this, stating that he "had it in [his] head *** to actually kind of do something pretty stupid and break the law by using my own vehicle to shove their vehicle off the side of the road." The defendant justified this line of thinking by stating that, "if there was an accident, the officers would show up, and whenever they did, they'd be more than happy to find what they found. Even though they weren't listening to [him], [the defendant would] get it to them one way or the other."

¶ 31    Defense counsel then directed the defendant's attention to the text message contained in the State's fourth exhibit, which was directly transcribed from that exhibit earlier in this order. The defendant first addressed these lines from his message: "You got less than half an hour and I'm gonna probably loose [*sic*] my shit!! *** [(angry expletive emoji)] My anxiety is in full force right now!! I am running on shear fumes!! Stress level to the f***ing max!!" The defendant explained that he had "been going through a lot of stuff with [his] family *** that had been keeping [him]

15

up at night," and he was worried about the alleged drug shipment coming in because "it was kind of a time-sensitive issue." The defendant next addressed these lines from his message: "And I'm gonna let you mf'ers nail me to the f***ing cross one last time. I don't even care no more!! The mf'ers ain't gonna hurt another shorty on my watch. And if it means I go back to the joint for doing the right thing then I don't give a f***!! Read me my right's, put me in jail. Take me downtown Barney lock me up!!" The defendant reiterated that "it was [his intention] that if [the deputies] didn't listen to what [he] was saying, [he] was going to stop it point-blank, no matter what," even if he "had to run [the drug dealers] off the road and use [his] vehicle as a weapon," which would have been "against the law" and for which he presumably would have been arrested for.

¶ 32    Next, the defendant addressed these lines from his message: "Shannon you goin through some shit right now with your family. I get it!! Mf'er you think I ain't know?!" The defendant clarified that he was not threatening Wolff or his family, but was referring to "the reason [Wolff] was stepping down [from] law enforcement." According to the defendant, he and Wolff had earlier conversations in which the defendant had encouraged Wolff to stay on as sheriff, but Wolff had insisted on stepping down due to family issues. The defendant then addressed these lines from his message: "You got your Wolfpack. And I got mine!! We can fight it out till the bitter end. Or you can let us help you. Either way I don't give a f*** no more!! In the end I will come out on top!! Because I've paid for my crime!! I'm standing on solid ground!! And I can't be shook. I'm extending my hand. You either gonna reach out and help me help you. Or you can come in thinkin I'm no good like my *** family." The defendant explained that when Wolff was running for sheriff, he called his supporters his "wolf pack." The defendant believed he had a "wolf pack" of his own, "a bunch of people [who have] been held down in society, and [are] tired of taking the blunt of everything and nobody ever listening to what [they] say." The defendant insisted that he

16

was "on solid ground," meaning that he was not doing anything wrong, but was instead "working [his] butt off[,] *** taking care of [his] grandma, *** taking care of [his] family, *** doing things the right way, and *** trying to help clean up the area." The defendant admitted that his wife did not "want [him] to get involved in this stuff" and told him to "just leave it alone [and] let [the deputies] handle it," but the defendant believed that the drug problem was "getting worse and worse," and the deputies had not "been doing a very good job of handling it."

¶ 33 The defendant then addressed these lines from his message:

"You know the routine. [Here's] the deal, I have what you need on the way to me right now. And I need my friend to ring this f***ing phone before it gets here!! You got less than 15 min. Otherwise you gonna waste a shit load of my time and effort trying to help our community. Every mf'er got a preconceived notion. Let me prove them wrong by taking all my struggles and turning them from bad to good. Asked you once before. I'll ask you again. Which side are you on?! 15 minutes is all I got. Don't be late!! You f*** this up that I have done invested so damn much time and money into and I ain't gonna invite you to the farm again."

The defendant again clarified that the "friend" he referred to was Deputy Rinehart. The reason he insisted on Rinehart calling him within 15 minutes was because he "needed to get ahold of [Rinehart] before the person showed up to give [him] the information of what was going to take place" regarding the drug shipment. He also testified that people had a preconceived notion about him, "sort of like [in] the video" he had sent Wolff.

¶ 34 The defendant next addressed these lines from his message: "I promise you I will walk right through those doors and come strait [*sic*] to you just like I did when y'all was investigating me for this bullshit I'm being charged with now!!" He clarified that by the "bullshit" he was being charged with now, he was referring to the arrest for the alleged battery against his uncle. Before that arrest, he had gone to the county jail and tried to talk to some officers there, "because if [he was] under investigation, [he didn't] have nothing to hide." Finally, the defendant addressed these lines from his message: "We not kids no more Shannon. Kids make mistakes. Adult's make

17

choices. Buddy you gonna learn today!! Now for the last time before you blow this! Have my friend call me!!" The defendant clarified that "buddy you gonna learn today" was not a threat towards Wolff, but was the defendant "explaining to him that [he was] going to learn exactly what [the defendant was] about," in that the defendant would combat "whatever preconceived notion [Wolff] had" about the defendant, "just like [in] the video," and "prove [himself] to [Wolff] *** [by taking] care of a problem [that had] been *** getting worse and worse."

¶ 35    The defendant testified that he sent Wolff the Brantley Gilbert *Read Me My Rights* music video because he understood that if he ran the drug dealers off the road, Wolff and his deputies would have to "come get [him]," and the defendant was willing to "take whatever time [he got]" so long as the community was kept safe from the drug shipment. The defendant testified that he sent Wolff the Twang and Round *I'm Still Here* music video because the video showed "the sheriff following these guys around thinking that they're involved in all this stuff," when it turned out that they were actually engaged in community service, and the defendant found that situation similar to his own.

¶ 36    The defendant testified that he believed that the uncle he had gotten into an altercation with and Wolff were friends, due to Wolff's refusal to believe the defendant's version of events regarding that situation. Defense counsel then turned the defendant's attention to the text message contained in the State's sixth exhibit, which was directly transcribed from that exhibit earlier in this order. The defendant explained that, by "check mate," he meant that "either [the deputies were] going to take care of the issue or [he was] going to take care of it by running the guy off of the road." The defendant further explained that "I love you, brother" was something he always told Wolff and something Wolff got "aggravated by" because, in the defendant's estimation, Wolff was

18

"not used to hearing that from other people, especially a grown man from prison." According to the defendant, Wolff once asked the defendant whether he believed Wolff was a homosexual.

¶ 37    Defense counsel then turned the defendant's attention to the State's seventh exhibit, which was a screenshot of texts the defendant sent Wolff on February 11. The first message was a link to a YouTube video entitled "Christopher Walken—I'm a millionaire—Poolhall Junkies," and the second was a link to a YouTube video entitled "Christopher Walken The Lion Speech." The contents of the second video have been transcribed earlier in this order. The defendant explained that he sent the first video ("I'm a millionaire") because in the movie from which the video clip was from, *Poolhall Junkies*, the main character "is hustling pool, *** trying to *** come up and make money and all that," and although "these other guys are pretty much antagonizing him[,] *** harassing him[,] *** trying to *** make him nervous so he'll lose the game *** and bunches of money[,] there's one person that's got faith in him, and that person said go in there and *** kick their ass in the pool game." The defendant explained that the video clip had "nothing to do with kicking nobody's ass or shooting nobody. It was in reference to a pool game that they [were] hustling." The defendant saw his life as a similar "hustle" because he "just [did] what [he could] to make it," including odd jobs like scrapping metal, commercially fishing, and working on the farm.

¶ 38    The defendant testified that he sent Wolff the lion speech video because he believed it was analogous to his family situation. The defendant described how his family had been "picking at [him] for years." They "[refused] to accept [him], [didn't] want [him] around, *** filed false charges" against him repeatedly, and "lied to [his] grandma" about him. The defendant lamented that the sheriff's department had "no intentions of taking care of any problems that [he had], *** but if somebody else [had] the same exact problem," that person would be attended to. The

19

defendant stated that "eventually [he needed] help," and that he was simply "asking for help and *** advice."

¶ 39     Defense counsel then directed the defendant's attention to the State's eighth exhibit, which was a screenshot of three text messages the defendant sent Wolff on February 11. The messages read:

> "I'm coming to you out of love with a heart full of pain. Up to you what you do from here. Have Shane call me!!
>
> Last one coming at ya. I'm tired of waiting!! Good day sir.
>
> Watch 'The 13 Truths—Matthew McConaughey [MOTIVATIONAL SPEECH]' on YouTube https://youtu.be/yjr3cuSUs2A"

The defendant first clarified the meaning of the first text message. The defendant testified that he texted that to Wolff because, although he had "done some things wrong, *** the things [he had] done wrong [did] not justify the punishment that [he had] been given." The defendant further testified that he "never had a thing against" Wolff and had "offered to help him many times, but he never [took] it." The defendant wrote that it was "up to" Wolff whether he wanted the defendant's help in stopping the alleged drug shipment. The defendant then addressed his third text message, the link to the Matthew McConaughey YouTube video. The defendant explained that the video was a "motivational speech [that] just [listed] all these different things that [were] positive," and could not in any "way, shape, or form" have constituted a threat to Wolff.

¶ 40     Defense counsel then directed the defendant's attention to the State's ninth exhibit, which was another screenshot of text messages between Wolff and the defendant on February 11. In that screenshot, Wolff first texts the defendant: "Chris I don't [understand] what you want me to do." The defendant then responds with this message:

"Buddy, I want you to understand I'm trying to help you. You refuse to speak with me. So I'm simply following what the Sheriff told me I needed to do. And I'm asking that you have Shane call me. I'm simply following the law."

Counsel pointed out that this was not Wolff's first query of the defendant. In screenshots from earlier exhibits, Wolff had previously asked the defendant, "What are you wanting me to do?" and "What does that mean?" The defendant explained that he did not respond to Wolff's earlier questions because he "was more concerned about getting Shane Rinehart to get ahold of [him]." The defendant also admitted that, at the time, he "was kind of going a hundred miles an hour" and "didn't really get some of the messages until after [he] was sending the other ones because [he] was busy typing when the messages [came] in." He was trying to "get [Wolff] to get Shane to call [him]" about the alleged drug shipment coming in because Rinehart was "the only one [he trusted]" from among the deputies. The defendant acknowledged that Wolff "[didn't] want *** to talk to him" but testified that he texted Wolff because he could not get ahold of Rinehart at the county jail.

¶ 41 Defense counsel then turned the defendant's attention to the State's tenth exhibit, which was a screenshot of a text the defendant sent Wolff on February 11. The text message reads:

"I'm not a bad man shane. You aren't either. I want you to work with me. But until you know me like Shane dose [*sic*] you can never understand. Let me try this again your way. Will you please have your Deputy Shane call me?!"

The defendant clarified that his first use of the word "shane" was simply a typographical error. The defendant testified that in this message, he was trying to be "nice and polite" because he wanted to make sure that Wolff was "not taking things the wrong way." The defendant acknowledged that, although he "didn't think he was, *** obviously he was." The defendant insisted on Rinehart calling him because Rinehart could "understand [him]" and was a "very good friend" of the defendant's.

21

¶ 42    Defense counsel then turned the defendant's attention to the State's eleventh and twelfth exhibits. The eleventh exhibit was a screenshot of two photographs the defendant sent to Wolff on February 11. The twelfth exhibit was a screenshot of one photograph the defendant sent to Wolff and two text messages Wolff sent in response on February 11. The photographs were of a sales receipt for a gun vault, a black gun vault, and an ammo box. The defendant explained that he sent these pictures to Wolff because sometime earlier, a deputy had come to his house and told him that he needed to store his guns in a vault or be arrested. The defendant "took that very seriously because [he was] not trying to go back to jail," and so, "the very next day [he] went out and *** bought a gun safe, *** an ammo box, *** [and] the receipt." The defendant then tried to call Wolff to tell him that he had rectified the situation and bought the necessary items, but Wolff's voicemail was unavailable. The defendant then thought that since the two of them had "been texting for years, [he'd] just go ahead and shoot him a message and show him what [he] did." The defendant testified that it had taken "every bit that [he] had in the bank" to get the necessary items.

¶ 43    The defendant testified that the issue of drugs was personal to him since his "momma was on dope [and he] was on dope at one point in time." Defense counsel then turned the defendant's attention to the State's fourteenth exhibit, a screenshot of three messages the defendant sent Wolff on February 11. The messages read:

> "Oh… And God Bless!!!!!!! [(eagle emoji, American flag emoji, eagle emoji, bowtie heart emoji)]
>
> I'm working my end. You work yours. And let's get it!! You know the law. I know the streets. My family can all kiss my ass. Hey, you ready? Let's get it!! I'm all in. Game over!!
>
> Thank you brother. Thank you from the bottom of my heart!! Amen!!"

The defendant testified that he "told [Wolff] a long time ago [that he] knew how to clean the community up, and [that he] could work with [Wolff] if he wanted [him] to, *** [but Wolff] told

22

[the defendant he] wasn't qualified [and] didn't know what [he] was talking about." The defendant thanked Wolff in the message because "at one point in time, Mr. Wolff seemed like he would listen to what [the defendant] would say and go above and beyond to help [him]." The defendant "would confide in him sometimes because [he] felt that [he] could trust him."

¶ 44    Defense counsel then turned the defendant's attention to the State's fifteenth exhibit, which was another screenshot of a text message the defendant sent Wolff on February 11. The message reads:

> "I never had the chance to prove to my father that I was a good man. [(sobbing emoji, sad emoji)] Please don't let the one woman who has never turned her back on me leave this earth before I can show her what she has known all along. I will wait for Shane to call. And again. Thank you from the bottom of my heart!!"

The defendant testified that the "one woman" he referred to was his grandmother, who he felt understood him. The defendant wanted Rinehart to call him because he felt that Rinehart was one of the few who "also [understood him] just like [his] grandma."

¶ 45    Defense counsel then turned the defendant's attention to the State's sixteenth exhibit, which was another screenshot of text messages between the defendant and Wolff on February 11. There were two messages from Wolff to the defendant, and one photograph the defendant sent to Wolff. The photograph was of a $25,000 check. The defendant testified "that was the check that [his] grandmother *** gave [him] *** to invest in a fishing boat." The defendant sent the photograph of the check to Wolff to show him that he had everything "under control" and was "all right" but just wanted Wolff's help with tackling the drug issues that concerned him.

¶ 46    Defense counsel then turned the defendant's attention to the State's eighteenth exhibit, which was a screenshot of a text message the defendant sent Wolff on February 11. The message reads:

"This fool Pete had DJ in a bind and forced him to sell shit. Pete got locked up. And now D is working with another guy. I tried to help him buddy. Really I did. But he isn't listening.. he's a good person. But I'm afraid that just like Justin Green, he's not gonna listen to reason till he is forced to. Just please know he has many kids that will suffer. And that's hard as f*** for me to know. But I know he has suffered just like me... and that his heart is just like mine. If you will just let me help you, I know he will tell you what he [knows]. But only if I convince him which I honestly believe I can do without an issue. But Darrell I'm sad to say, I know he will not ever talk. Unless he has no choice. Darrell is trying his best to raise all his grand kids while his own kids are hooked on the shit too. And he is doing this while he knows hes dieing [*sic*] and literally dose [*sic*] not give a shit about anything but his family. Use what I'm telling you. Please use it to make a case [against] these people who are killing us with this shit they are pushing!! I swear to you I am probably throwing everything away that I ever had good in my life. But if it means I can help others not go through this world the way I had to. Then I will take that cross up to. I have dream's too man. But all I ever find is nightmares that haunt me and torment me daily!! My grandson birthday is coming up next weekend. All I ask is that you let me live my life and help me put my demon's to rest. That is all I ask. Please!!"

The defendant testified that his mother "had paranoid schizophrenia, multiple personality, and she was hooked on dope like you wouldn't believe." He alleged that his "stepmother tried to make [him] out that way." The defendant clarified that Pete, DJ, D, Justin Green, and Darrell were all people from his past that had been in trouble before and were now involved in the drug trade in some way or another.

¶ 47    Defense counsel then turned the defendant's attention to the State's nineteenth exhibit, which was another screenshot of a text message the defendant sent to Wolff on February 11. The message is directly transcribed from that exhibit below:

"When Darrell lived in Percy he was going to kill himself. Took me 3 days of endless night's to talk the pistol out of his hands when he was going to end his life.... we're all hurting man. In our hearts we are good people. But life has completely destroyed us. And all I want is to end it all. Not end it all like my momma did. Don't get it twisted. Told you I'm not crazy. The [craziness] is what I'm trying to end. Jeremy Walker is a good man!! And I shook his hand when I seen him in the court house. I told him that I was so happy to see him take the office that he holds currently. And told him a criminal don't stand a chance now. I only hope he has mercy on me and I was right about him. I believe justice will be served!! Because good always overcomes bad. Don't believe that? You better look in the Good book. I am very sorry I caused you grief Shannon. I just don't know how to help any other way when people's pride and preconceived notions won't let me. For what it's worth. I AM SORRY BUDDY. PLEASE BELIEVE ME!! I'm willing to [lose] it all."

The defendant explained that his mother committed suicide by jumping off a bridge, and that, as a result, he had no "direction except for [his] grandmother." The defendant believed that his life generally was "a mess," and lamented that he had "a history" that was "a mile long." The defendant noted that, although he and his friends had struggled and continued to struggle with drug use, they were all good people "bound by their struggles in life" who were "trying to do the right thing." The defendant explained that he mentioned the State's attorney (Jeremy Walker) because he hoped he would be able to secure Walker's help and not have to push the alleged drug dealers off the road with his car. He mentioned being willing to "[lose] it all" because he would have to "get representation if [he] *** [ran] these people off of the road," and that would result in him having no money left.

¶ 48    The defendant testified that he was arrested before receiving one of Wolff's last texts on February 11, which was: "I get it man, I understand." According to the defendant, Wolff later visited him in jail and "told [the defendant] he understood everything that [the defendant] told him and that he was going to take care of it and try to get [the defendant] up out of there and put [him] back home where [he] would be more comfortable." The defendant testified that, after he went to jail, while he was going to the bathroom on "a metal toilet sitting right next to the shower," the officers told him to get into the shower. However, the defendant believed he had earlier seen feces in the shower and refused. The officers then told him to "get [his] ass in the shower, and if [he] didn't, *** they were going to lock [him] back up." The defendant told the officers that he was "in handcuffs" and was still "trying to take a poop." One officer then "pretty much pulled his taser gun out and told [him] to get up now or else." The defendant pleaded with the officer to stop, but the officer "just grit his teeth and *** looked like an evil whatever," and "pulled the trigger and

25

let it fly." The defendant insisted that, although he had not been aggressive at all, he was hit with the taser dart while "naked sitting on the toilet in handcuffs."

¶ 49 The defendant testified that the officers then told him to get into a chair and be strapped down. The defendant acquiesced "because [he] knew there wasn't no winning." The defendant admitted that he "was madder than hell" and "wanted to know why [he] was in there." The officers repeatedly told him that he had threatened Wolff, and the defendant firmly disagreed. The defendant asked for Wolff to come talk to him "because everybody wanted [the defendant] to calm down." When Wolff arrived, he "just looked at [the defendant] with a smug look and grinned real big and said, 'What do you want, Diercks?' " The defendant asked Wolff whether he wanted to tell the defendant something. The defendant clarified that, although he was extremely angry at this time, he had not been so while sending the earlier text messages to Wolff. The defendant insisted that while sending the text messages to Wolff, he was "begging him for help," he had no intention of threatening Wolff, and he did not believe the texts were threatening.

¶ 50 On cross-examination, the defendant admitted that Wolff told him on February 6 to stop contacting him. The defendant acknowledged that, while sending the February 11 text messages, he was "mad at [his] Uncle Rick" and about "not being believed" but insisted that he was not mad at Wolff. The defendant explained that he just "wanted somebody to hear [his] side of the story." He admitted that he had been up all night on the night of February 10 "waiting on information" about the alleged incoming drug shipment, and that his mindset on February 11 was therefore "so angry over this dope" that he was willing to "run somebody off the road be damned the consequences" if he "didn't get help." The defendant denied that the term "Barney Fife" had any negative connotation. The defendant felt "very much so" that it was "unreasonable" for Wolff to perceive his February 11 text communications as a threat to him or his family's safety. To the

26

State's question of whether the defendant's "mental state that day included all of this anger that boiled over," the defendant answered: "If you say so." To the State's assertion that the defendant's February 11 texts to Wolff served as his "airing of grievances," the defendant responded: "If that's the way you want to say it, then I guess you're right."

¶ 51 The defendant disputed that the Christopher Walken videos that he sent to Wolff were in any way meant as a threat. The defendant admitted that one of the sentences he wrote in his text message from the State's fourth exhibit, "Buddy you gonna learn today," could have been "perceived" as a threat, but insisted that "it wasn't never meant that way." The defendant testified that the officers didn't "understand who [he was], and [he was] just trying to show them," and had "been trying for a long time." He admitted that he knew Wolff did not like being texted, "I love you [brother]," but that he did so anyway because he was used to sending that "to everybody." The defendant acknowledged that he could "see where [the court] maybe" could infer that he wanted to cause harm to Wolff. He disagreed that the inconsistencies in his testimony affected his credibility, insisting that the State had "twisted [his] words up." He also disagreed that his testimony that he was "going a hundred miles an hour" while sending the February 11 texts to Wolff was a "sign of somebody that's angry or mad," and instead insisted it was only "a sign of somebody that's very tired and [worn] out *** [and who is] trying to do so much that *** it's like [they are] going a hundred miles an hour."

¶ 52 The defendant testified that, while Wolff had told him "a long time ago" not to contact him, more recently, Wolff "had been messaging [the defendant] and talking to [him] on the phone." The defendant admitted that he had "a very strange way with [his] words" and that the way he spoke was "rough around the edges." Furthermore, he admitted that he "was frustrated at the situation[,] *** angry with [his] Uncle Rick, and *** upset that [he] was going to law enforcement to get help,

and *** they [didn't] want to hear anything [he had] to say." The defendant testified that he sent Wolff the pictures of the gun safe, ammo box, and receipt because he "was asked to." The State then asked the defendant about exhibit 13, which was not provided to this court. The State alleged that, in one message from that exhibit, the defendant wrote: "Why is it so fuuuuccckkking hard to believe?!!!!!" The State asked the defendant whether this message was "nice or polite," to which the defendant responded that "nice or polite ain't got nothing to do with the facts."

¶ 53   The defendant testified that he was not "mad at Shannon because he called [the defendant] a lowlife sex offender," but he "was upset that [Wolff] would say those things to [him]." The defendant clarified that "upset and mad [had] two different meanings to [him]." The defendant agreed that "that was also sprinkled in [his] mindset that day on February 11." The defendant again testified that he was only "trying to get help." The State then directed the defendant's attention to exhibit 19, which was a screenshot of a text message wherein the defendant wrote to Wolff: "I am very sorry I caused you grief Shannon." The State's Attorney asked the defendant if this sentence signified that the defendant "knew that what [he] had done was wrong." The defendant answered in the negative. He testified that he did not provide Wolff with a clearer explanation for his behavior because, before he could do so, "they locked [him] up and they beat the heck out of [him]." The defendant conceded that "the body camera footage [didn't] look good at all, because [he] was going out of [his] mind from all the stuff [he] was involved with" and "everything that was happening to [him] in the jail."[1] The defendant clarified that he only became angry "after the messages *** whenever [he] was locked up in the jail." The defendant conceded that, at that time, he "was quite angry" because he had been "locked in that chair and being beat the crap out of and

---

[1]Nothing in the record clarifies whether the body camera footage referred to here is footage of the defendant's arrest, of the defendant's time in jail prior to trial, or of some other related incident. Additionally, no body camera footage was made available to this court.

28

denied food and water, got MRSA infection, had to go to the \*\*\* hospital[,] \*\*\* was denied medical treatment for three and a half weeks, [and] \*\*\* was not allowed to use [his] BiPAP machine." The defense then rested.

¶ 54    The trial court found the defendant guilty of the offense of stalking. The court noted that, although "perhaps there isn't one incident or statement or writing that the Court would conclude as stalking, \*\*\* when you take it all as a whole together, \*\*\* the defendant knowingly engaged in a course of conduct directed toward Shannon Wolff at a time the defendant knew such conduct would cause a reasonable person \*\*\* to fear for his safety and \*\*\* the defendant had repeatedly sent text messages to Shannon Wolff of a threatening nature." The court expressed its belief that "the text messages that the defendant sent would cause, when you take them altogether, \*\*\* a reasonable person to fear for his safety." At the defendant's sentencing hearing on October 28, 2022, the trial court sentenced the defendant to a two-year period of conditional discharge with an order to pay a $450 fine and a $50 bond fee. The defendant was furthermore ordered to have no contact with and to not be within 500 feet of Wolff or his family. This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56    On appeal, the defendant argues that this court should reverse his conviction outright where the State failed to prove him guilty of stalking beyond a reasonable doubt, and where his conviction for stalking violated both his first amendment rights under the United States Constitution as well as his rights under the Illinois Constitution's free speech clause.

¶ 57    We agree that the State failed to prove the defendant guilty of stalking beyond a reasonable doubt and reverse his conviction on those grounds. As that is enough for this court to reverse the defendant's conviction, we decline to address his remaining constitutional claims.

29

¶ 58    The defendant was convicted of stalking, a Class 4 felony, under section 12-7.3 of the Criminal Code of 2012. 720 ILCS 5/12-7.3(a)(1) (West 2022). The relevant section of the statute states as follows:

> "(a) A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:
>
> *** fear for his or her safety or the safety of a third person[.]"[2] *Id.*

The statute defines "course of conduct" as follows:

> "(1) 'Course of conduct' means 2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, *threatens*, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications." (Emphasis added.) *Id.* § 12-7.3(c)(1).

Here, the State alleged that the defendant committed the offense of stalking, pursuant to the statute, when he "knowingly engaged in a course of conduct directed at Shannon Wolff at a time the defendant knew such conduct would cause a reasonable person to fear for his safety, in that the defendant has repeatedly sent text messages to Shannon Wolff of a threatening nature."

¶ 59    At trial, the State endeavored to prove the following elements of the offense: (1) that the defendant's statements constituted "true threats"; (2) that the defendant engaged in a "course of conduct" by sending Wolff two or more threats; (3) that the alleged threats were directed at Wolff; (4) that the defendant had the specific intent to threaten Wolff or was consciously aware of the threatening nature of his speech; and (5) that the defendant's statements would cause a reasonable

---

[2]In *People v. Ashley*, 2020 IL 123989, our state supreme court held that the statute's "should know" standard was overly broad and cannot be constitutionally applied with regard to a course of conduct that "threatens." The court construed the term "threatens" as referring to true threats of unlawful violence, requiring proof that the accused be consciously aware of the threatening nature of the speech that falls outside of first amendment protections. The court concluded that the negligent mental state of "should know" could not satisfy that standard.

person to fear for his safety. The defendant alleges that the State failed to prove any of these elements beyond a reasonable doubt, and that his conviction should therefore be reversed.

¶ 60 When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Gonzalez*, 239 Ill. 2d 471, 478 (2011). However, the fact that a judge or jury accepted testimony or evidence does not necessarily mean that it was reasonable to do so. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Id.* While the reviewing court must allow all reasonable inferences from the record in favor of the prosecution, it may not allow unreasonable inferences. *Id.* If only one conclusion may reasonably be drawn from the record, a reviewing court must draw it, even if it favors defendant. *Id.*

¶ 61 According to the Illinois Supreme Court in *People v. Ashley*, the "threatens" provision of the stalking statute refers solely to " 'true threats' of unlawful violence such as bodily harm, sexual assault, confinement, and restraint" that the speaker knows would cause a reasonable person to fear for his or her safety. 2020 IL 123989, ¶ 47. "True threats" are statements where the speaker "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (Internal quotation marks omitted.) *Id.* ¶ 33. This does not include "lawful, nonviolent conduct such as *** distressing speech that does not consist of a threat of unlawful violence." *Id.* ¶ 92. Additionally, for speech to qualify as a "true threat,"

although the speaker need not have "specific intent to threaten the victim," he "must be subjectively aware of the threatening nature of the speech." *Id.* ¶¶ 58, 56.

¶ 62    In *Ashley*, the supreme court found that the defendant made "true threats" that qualified under the "threatens" provision of the stalking statute where he texted his girlfriend messages that included: "But [I] guarantee u this. I can make u suffer. If [I] want to"; "You rite start to think more before u talk that s*** will get u hurt or killed"; "I hope whoever you got it when I got guns"; and a photograph of a handgun. *Id.* ¶ 9. Defendant also called and threatened to kill his girlfriend over the phone. *Id.* ¶ 100. In *People v. Crawford*, the First District Appellate Court concluded that the defendant made "true threats" where he texted his ex-girlfriend messages that included: "U GONE DIE"; "I WILL F*** MURDER U"; and "GET READY TO MEET YOUR MAKER." 2019 IL App (1st) 160184, ¶¶ 7, 76. A police officer also heard defendant tell his ex-girlfriend "I will kill you" twice over the phone. *Id.* ¶ 9.

¶ 63    However, in *People v. Relerford*, the Illinois Supreme Court found that the defendant made "vulgar and intrusive" posts amounting only to "distressing communications" rather than "true threats" where he made Facebook posts about the alleged victim which included: "This is a motherf***ing order: If my shit gets shut down by any and everyone who does, dies"; "If [the alleged victim]'s vagina is not in my mouth by next Friday, bury the entire Michigan State football team from 1993"; and "I want to f*** [the alleged victim]." 2017 IL 121094, ¶¶ 69, 39, 11. Similarly, in *People v. Smith*, the Fourth District Appellate Court found that defendant did not make "true threats" where he left a "rambling" voicemail message to a judge that called the judge a "cock-sucker" and a "corrupt son of a bitch"; warned the judge that he would "be hearing more from someone"; and advised him that he had "another chance to *** reconsider while he's *** got a chance to" because defendant was "trying to go about things legally" and would "take it from

32

there." 2019 IL App (4th) 160641, ¶¶ 17, 28. The court also found that defendant did not make "true threats" where he filled out multiple inmate-request slips to the judge citing but not quoting various Bible verses, which, when looked up, revealed quotes such as: "Let death seize them"; "Their judges are overthrown by the sides of the cliff"; "I will render vengeance to my enemies and repay those who hate me. I will make my arrows drunk with blood, and my sword shall devour flesh"; and "I will cut off the judges from its midst." *Id.* ¶¶ 70, 33, 34. The court explained that there was "no explicit threat of violence," and that "the statement[s] [were] ambiguous in the message [they sought] to convey at worst, and at best, *** [related the] defendant's belief [that the judge was] corrupt." *Id.* ¶ 78. The court continued, writing that, although the messages were "rude and insulting," they did not constitute "true threats," as the language used "[revealed] no intent to cause physical injury," but rather, an intent "to prove [the judge] guilty of corruption." *Id.* ¶¶ 70, 84. The court concluded that "[t]o speculate a violent intent" in this case would be "improper" as the evidence did not "show defendant's intent to make a threat of physical harm." *Id.* ¶¶ 78, 79.

¶ 64　　In the present case, the State alleges that the defendant made "true threats" to Wolff in his text messages, which included the following: "Hey f***er, take your BBQ and stick it up your mf'ing ass"; "So now, I got just two more moves to make and I'm hoping it's gonna help you sorry ass SOB's who took my life from me"; "I am literally running on fumes"; "I wont's [*sic*] ask nicely again"; "You got less than half an hour and I'm gonna probably loose [*sic*] my shit"; "You got your Wolfpack. And I got mine!! We can fight it out till the bitter end. Or you can let us help you"; "In the end I will come out on top"; "You got less than 15 min"; "Buddy you gonna learn today"; and "I promise you I will walk right through those doors and come strait [*sic*] to you just like I did when y'all was investigating me for this bullshit I'm being charged now!!" The State also alleges that the defendant made "true threats" directed at Wolff by sending three links to songs with lyrics

33

such as "We done took it outside we're about to brawl"; "The next thing comin' is a ass whoopin' in the parkin' lot"; and "Ya gotta whoop a man's ass sometimes." The State also cites the fact that the defendant sent Wolff photographs of a receipt for a gun vault, a gun vault, and an ammunition box. The State argues that each one of these messages constituted a separate and distinct threat to Wolff.

¶ 65    However, even considering all the evidence in the light most favorable to the State, we cannot say that *any* rational trier of fact could have found beyond a reasonable doubt that any of the statements above constituted "true threats" qualifying under the "threatens" provision of the stalking statute. Although the defendant's statements were rambling, ambiguous, confusing, and vague, they did not threaten Wolff with unlawful violence or bodily harm. At worst, the messages were "distressing communications" demonstrating the defendant's anger and frustration with Wolff. To imply any threat of violence in the defendant's messages would constitute unjustified and unreasonable speculation by this court on behalf of the State, which we cannot and will not do.

¶ 66    For the foregoing reasons, we conclude that the State failed to prove beyond a reasonable doubt that the defendant made "true threats" against Wolff. As a failure of proof on one element of the offense is sufficient to reverse the whole, this court reverses the defendant's stalking conviction outright. As we have decided the reversal on lesser grounds, we decline to address the defendant's remaining constitutional claims.

¶ 67                                        III. CONCLUSION

¶ 68    Therefore, the order of the circuit court of Randolph County convicting the defendant of stalking is hereby reversed.

¶ 69    Reversed.

34